Myron J. SCHUSTER, Plaintiff,

v.

DRAGONE CLASSIC MOTOR CARS,
INC., et al., Defendants.

No. 99 CIV 2163 (LAK).

United States District Court,
S.D. New York.

May 23, 2000.

Jeffrey R. Hellman, Gregory B. Schiller, Zeisler & Zeisler, P.C., for Plaintiff.

Joseph W. Martini, Zachary R. Osborne, Pepe & Hazard LLP, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Myron Schuster is a collector of antique automobiles. He contends that defendant dealer, Dragone Classic Motor Cars ("Dragone Classic"), and its two principals, defendants Emanuel Dragone ("Emanuel") and George Dragone, defrauded him in two separate transactions–the first, an alleged loan of $2,125,000, and the second, the purchase of a 1939 Bugatti Type 57. His claims include breach of contract, fraud, breach of fiduciary duty, unjust enrichment, and violation of the Connecticut Unfair Trade Practices Act. Defendants counterclaim based on plaintiff's alleged failure to pay for repair and restoration services performed by defendants on four of plaintiff's automobiles. Plaintiff here moves for summary judgment on two of the counts stemming from the alleged loan as well as all of defendants' counterclaims.

### Facts

For purposes of this motion for summary judgment, defendants' factual allegations are assumed to be true.

#### The Alleged Loan

In April 1997, defendant Emanuel Dragone entered into an oral agreement with Giorgio Ierussi, a purported representative of the Benetton race team, to purchase a partial interest in a private collection of automobiles allegedly being sold by the Italian bankruptcy court in Rome.[1] On April 22, 1997, pursuant to this oral agreement, Emanuel caused to be wired to Ierussi $502,364, which Ierussi agreed to pay

---

1. E. Dragone Aff. ¶¶ 10–13.

to the bankruptcy court.[2] In exchange for this payment, Emanuel was to receive a number of automobiles from the collection, which was to be released by the court in sixty days.[3] On or about June 2, 1997, Ierussi informed Emanuel's agent, Keith Duly that, in order to complete the purchase from the Italian bankruptcy court, Ierussi needed to purchase an additional twelve automobiles.[4] Ierussi requested that Emanuel purchase a one-half interest in these automobiles, which would require Emanuel to invest an additional $2,125,000.[5] Without this additional investment, Ierussi represented, Emanuel would have to forfeit the right to purchase the automobiles for which he already had wired $502,364.[6]

Emanuel agreed to participate in the transaction and, as he did not have sufficient funds available, began to seek financing.[7] Duly approached Abraham Kogan, an automobile collector, who agreed to provide $2,125,000 in financing.[8] As part of his repayment, Kogan was to receive one or two automobiles of his choice from the group.[9] Emanuel understood that, according to the agreement with Ierussi, Dragone Classic would market and sell the remaining automobiles.[10] Benetton would receive fifty percent of the profit, and the remaining fifty percent would be shared among Emanuel, Kogan, Duly and one other.[11]

Emanuel learned soon thereafter that the money for the purchase of the twelve automobiles had to be paid to the Italian bankruptcy court by June 4, 1997.[12] Kogan informed Duly that he could not come up with the money until approximately June 16, but agreed to execute a promissory note for $2,125,000 payable to Dragone Classic on June 16, 1997.[13] Using the promissory note as collateral, Emanuel approached plaintiff Myron Schuster and proposed that Schuster act as a bridge lender until Kogan was able to obtain the necessary funds on June 16.[14] After some discussion, Schuster agreed to lend Emanuel the money for the two week period provided that Emanuel permit Schuster to purchase from among the group of twelve automobiles a short wheel base California Spyder for $450,000, which represented a substantial discount off the market value.[15] Emanuel consented, and Schuster promptly wired $2,125,000 to the account of Emanuel's attorney, Andre Nagy, who then transferred the money to a bank account in Italy purportedly belonging to Benetton.[16]

On the evening of June 3, after Schuster wired the finds to Nagy, Emanuel, individually and as president of Dragone Classic,[17] executed a promissory note payable to Schuster that he believed reflected the oral agreement between him and Schuster.[18] This note was faxed to Schuster that same night.[19] Four days later, on June 7, Schuster arrived at Dragone Clas-

2. *Id.* ¶¶ 14–15.

3. *Id.* ¶¶ 13–14.

4. *Id.* ¶ 16.

5. *Id.* ¶¶ 16–18.

6. *Id.* ¶ 16.

7. *Id.* ¶¶ 17–18.

8. *Id.* ¶ 18.

9. *Id.* ¶ 19.

10. *Id.*

11. *Id.*

12. *Id.* ¶ 20.

13. *Id.* ¶¶ 20–21.

14. *Id.* ¶ 22.

15. *Id.* ¶¶ 23–24.

16. *Id.* ¶¶ 24–25 & Ex. D.

17. George Dragone also signed individually the promissory note. *Id.* Ex. E.

18. *Id.* ¶¶ 26–27.

19. *Id.*

sic with a new draft agreement dated June 4, 1997 which Emanuel executed without reading.[20]

On or about June 16, 1997, Duly informed Emanuel that Kogan needed additional time to come up with the funds.[21] Emanuel contacted Schuster, who agreed to extinguish the prior agreement for the bridge loan and remain in the deal in exchange for three cars from the group of twelve–the short-wheel base California Spyder, a short-wheel base Berlinetta steel body, and a 500 Testarossa–at a total discount of at least $200,000.[22] Because the condition and value of the cars was not known,[23] the parties left to be determined the exact amount of the discount and the amount of cash, if any, that Schuster would get back from the deal.[24] However, Schuster told Emanuel, "I don't want the money back. I want the cars. Get me good cars that are in the group."[25] He stated also that he would prefer to receive additional cars rather than cash.[26] As part of this agreement, Emanuel caused Ierussi to execute a written guarantee that the money would be returned to Dragone Classic in the event that the twelve cars were not delivered.[27] After receiving Schuster's oral commitment to the agreement, Emanuel canceled Kogan's promissory note at Schuster's request and informed Schuster of the cancellation.[28]

During the weeks following the June 16, 1997 agreement, Schuster frequently visited Dragone Classic to discuss the deal with Emanuel, Duly, George Dragone and others.[29] During some of these meetings, they researched the history of the automobiles involved, particularly those which Schuster was interested in acquiring.[30]

In July and August 1997, Emanuel visited Italy and learned that Ierussi's representations to him about the availability of automobiles for sale in the Italian bankruptcy court had been fraudulent.[31] Emanuel attempted to recover from Ierussi the funds he had transferred to Italy on behalf of himself and Schuster, but was able to obtain only $55,142.[32] Emanuel since has commenced litigation in Italy against Ierussi to recover this money and is working with Italian law enforcement authorities, who apparently have begun a criminal prosecution.[33]

*Repair and Restoration Work*

On fifteen occasions between 1992 and 1998, Dragone Classic performed repair or restoration work on automobiles owned by Schuster.[34] On no occasion did Schuster demand, nor did Dragone Classic provide, a written estimate before Dragone Classic performed the work.[35] Instead, in accordance with standard practice of antique car restoration and repair,[36] Schuster agreed to pay for the services on a "time

**20.** *Id.* ¶ 28. Emanuel signed both individually and as president of Dragone Classic. George also signed the promissory note in his individual capacity. *Id.* Ex. F.

**21.** *Id.* ¶ 30.

**22.** *Id.* ¶¶ 31–34, 36–37.

**23.** The automobiles were in Italy, and neither Schuster nor Emanuel had an opportunity to examine them. *Id.* ¶ 38.

**24.** *Id.*

**25.** *Id.* ¶ 34.

**26.** *Id.* ¶ 38.

**27.** *Id.* Ex. G.

**28.** *Id.* ¶¶ 35–36 & Ex. H.

**29.** *Id.* ¶ 39.

**30.** *Id.*

**31.** *Id.* ¶ 42.

**32.** *Id.*

**33.** *Id.* ¶¶ 5, 42–43.

**34.** *Id.* ¶ 45.

**35.** *Id.* ¶¶ 47–50.

**36.** *Id.* ¶ 48.

and materials basis." [37] He consented in advance to pay $65 per hour for labor. and pay for all the required materials and was periodically updated as to the status of the work, the costs incurred, and the volume of work yet unfinished.[38] Dragone Classic never performed substantial work· or obtained costly parts without first discussing the expected cost with Schuster and obtaining his express consent.[39] All agreements between the parties concerning repair and restoration work were oral.[40]

On eleven of these fifteen occasions, Schuster made timely payment in full to Dragone Classic.[41] However, Schuster has not paid Dragone Classic for the four most recent jobs, despite his prior oral agreement to do so, and claims that he was over-billed for the work.[42]

### Claims and Counterclaims

The second amended complaint contains six claims for relief. Counts I and II, those that are the subject of this motion, assert breach of contract and unjust enrichment claims respectively based on defendants' failure to pay the June 4, 1997 promissory note.

Defendants assert three counterclaims, all of which stem from Schuster's alleged failure to pay for the repair and restoration services. The first is for breach of contract, the second statutory theft, and the third unjust enrichment.

37. *Id.* ¶ 47.

38. *Id.* ¶¶ 47, 49.

39. *Id.* ¶ 49.

40. *Id.* ¶¶ 47–50.

41. *Id.* ¶ 50.

42. *Id.* ¶¶ 51–52.

43. The June 4 promissory note contains a New York choice of law provision.

44. N.Y. Unif. Comm. C. § 3–104 (McKinney 1991).

Plaintiff moves now for summary judgment on Counts I and II of the second amended complaint and on all three counterclaims.

### Discussion
### Breach of Contract Claim

Defendants object to the breach of contract claim principally on the ground that the June 4 promissory note was extinguished when the parties agreed orally to abandon the bridge loan agreement and replace it with a joint venture arrangement in which Schuster would replace Kogan in the deal in exchange for three cars from the group of twelve. In consequence of this substitution, they contend, the June 4 note is unenforceable. Plaintiffs dispute this proposition· on three grounds.

### Negotiable Instrument

■ Plaintiff claims as a preliminary matter that the June 4 note is a negotiable instrument which cannot be extinguished by oral agreement.

Under New York law,[43] a negotiable instrument must "contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power." [44] Although negotiable instruments cannot be extinguished by oral agreement,[45] the June 4 note does not qualify as such because it does not contain an unconditional promise to pay a "sum certain in money," but requires defendants to satisfy part of the debt with the Ferrari Spyder.[46] In consequence, the rule bar-

45. *Id.* § 3–605.

46. *See, e.g.,*N.Y. Unif. Comm. C. § 3–107; *Chrysler v. Renois,* 43 N.Y. 209 (1870) (an instrument for payment in merchandise is not a negotiable instrument); *Tradition North Am., Inc. v. Sweeney,* 133 A.D.2d 53, 53–54, 518 N.Y.S.2d 982, 983 (1st Dept.1987) (note that can be satisfied by either payment of a fixed sum of money or the equivalent in work is not a negotiable instrument). Defendants have alleged that the value of the Ferrari Spyder was unknown at the time the note was executed, E. Dragone Aff. ¶ 24 n. 2, but this is of no import, as even were the value known and fixed, the note nonetheless would not qualify as a negotiable instrument because it does not provide for payment in money only.

ring oral cancellation of negotiable instruments is inapplicable to this motion.

### Alleged June 16 Contract

Plaintiff rejoins also that the alleged agreement between the parties to replace the June 4 note does not qualify as a novation and therefore is legally insufficient to cancel the note.

 Under New York law, a novation requires (1) a previously valid obligation, (2) agreement of all parties to a new contract, (3) extinguishment of the old contract, and (4) a legally valid new contract.[47] Defendants have alleged that on or about June 16, the parties agreed that the prior bridge loan agreement was extinguished, defendants would cancel Kogan's promissory note, Schuster would replace Kogan in the deal in consideration for his $2,125,000 payment, Schuster would receive three cars from the group of twelve at a discount, and the exact amount of the discount and the amount of cash, if any, Schuster would get back would be determined based on the condition and value of the cars.[48] Plaintiff disputes that these allegations satisfy the last three elements of the novation standard.

Defendants' allegations, if true, clearly would establish the agreement of all parties to a new contract and the extinguishment of the old contract. Plaintiff's only nonfrivolous argument with respect to the validity of the novation is that defendants do not allege a valid new contract. In this respect, plaintiff makes three arguments, all of which ultimately are unavailing.

Plaintiff contends first that defendants' testimony regarding the alleged June 16 deal is inconsistent because the deal between Emanuel and Kogan was alleged to be on different terms than the alleged deal between Emanuel and Schuster, suggesting that defendants prevaricated about one or the other. This is simply illogical. Although defendants claimed that Schuster agreed to "take over Kogan's position in the deal,"[49] they never suggested that Schuster agreed to do so on the same terms as Kogan. Any alleged inconsistency, therefore, is illusory.

Plaintiff claims second that the terms of the alleged June 16 deal are impermissibly indefinite because Emanuel testified that he and Schuster did not settle on the precise amount of cash Schuster would receive from the June 16 deal. A contract will not be rejected as indefinite unless it "cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear."[50] Failure to specify a price term does not void an agreement for indefiniteness when that figure can be determined objectively without the need for new expressions by the parties, such as by reference to an extrinsic event, commercial practice, or trade usage.[51] In this case, Emanuel testified that the parties did not establish precisely how much cash Schuster would receive but instead decided that the amount would be ascertained based on the condition and value of the cars that plaintiff had selected.[52] His testimony reasonably suggests that the parties intended that Schuster

---

47. See, e.g., In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 82–83 (2d Cir.1996); Wasserstrom v. Interstate Litho Corp., 114 A.D.2d 952, 954, 495 N.Y.S.2d 217, 219 (2d Dept.1985).

48. E. Dragone Aff. ¶¶ 31–34, 36–38.

49. Id. ¶ 36.

50. See, e.g., Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp., 74 N.Y.2d 475, 481, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203 (1989).
 The Court declines to resolve the question of whether New York or Connecticut law

applies to this issue, as the outcome appears to be the same under either state's law. See Constitution Bank and Trust Co. v. Robinson, 179 Conn. 232, 425 A.2d 1268, 1271 (1979) (where open interest rate term in contract can be determined by reference to the marketplace, contract is not impermissibly indefinite).

51. See, e.g., id. at 483, 584 N.Y.S.2d at 923.

52. See supra notes 22–25 and accompanying text.

receive in cars and cash the equivalent of at least $2,325,000, which represented the $2,125,000 he originally invested in the deal plus the agreed upon profit of at least $200,000. As alleged, this agreement is not indefinite, but merely leaves the amount of cash to be determined upon Emanuel's inspection of the cars. If Emanuel thereafter failed to provide to Schuster with cars and cash valued at $2,325,000, Schuster would have a breach of contract claim against him and could seek a remedy for the balance due. In consequence, as all of the material terms arguably can be determined by reference to the agreement or external indicators, the alleged contract is sufficiently definite and therefore enforceable.

Plaintiff contends, third, that the alleged June 16 agreement in any event does not qualify as a joint venture under New York law and that the alleged novation therefore is invalid.[53] This is wholly beside the point. Defendants adequately have alleged a substitute agreement. Whether the agreement qualifies as a joint venture or merely a simple contract is immaterial to the validity of the novation.

In consequence, defendants adequately have alleged all four elements of a novation.

### Waiver of Defenses

Plaintiff contends finally that defendants are barred as a matter of law from asserting any defenses, including novation, because the June 4 note contains a waiver of defenses and counterclaims.[54]

Under New York law, a waiver of defenses generally is enforceable and precludes defendants from asserting fraud, failure of consideration, negligence or failure to perform a condition precedent as a defense to enforcement of the contract.[55] It does not, however, preclude defenses concerning the validity of the waiver clause itself, including defenses of novation or modification, which turn on events occurring after execution of the contract and that therefore are not encompassed by the language of the contract.[56] As discussed above, defendants adequately have alleged that the June 4 note was extinguished in its entirety and replaced by a June 16 oral agreement between the parties.[57] This alleged novation covered all terms of the June 4 note, including not only the defendants' promise to pay $1,675,000 plus the Ferrari Spyder to plaintiff, but also the waiver of defenses clause. Therefore, in light of the novation defense, summary judgment for plaintiff on the breach of contract claim is inappropriate.

### Unjust Enrichment

In order to prevail on the unjust enrichment claim, plaintiff must establish that (1) defendants were enriched, (2) the enrichment came at plaintiff's expense, and (3) defendants' failure to pay plaintiff for

---

53. Pl. Mem. at 15–16.

54. Pl. Mem. at 7. In relevant part, this clause provides that "Payors waive the right to ... raise any counterclaim, affirmative defense, set off or any other issue, claim or matter with regard to any other transactions between the parties in any litigation to collect monies owed under his note or for delivery of the aforesaid Ferrari or for damages as a result of the failure to deliver such Ferrari." E. Dragone Aff. Ex. F.

55. *See, e.g., Citibank N.A. v. Plapinger,* 66 N.Y.2d 90, 93, 495 N.Y.S.2d 309, 310, 485 N.E.2d 974 (1985). It is worth noting, however, that the defense of fraud may be raised under limited circumstances despite a waiver

of defenses clause. *See also Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 317 (2d Cir.1993); *General Motors Acceptance Corp. v. Morgese,* 161 A.D.2d 1019, 1020–21, 557 N.Y.S.2d 590, 591 (3d Dept.1990).

56. *See Union Mutual Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 12–14 (1st Cir.1986) (defendant may avoid liability under lease containing waiver of defenses by showing novation or other form of release); *FDIC v. O'Donnell,* 136 B.R. 585, 592 (D.D.C.1991) (waiver of defenses does not warrant summary judgment where defendants allege novation of the contract containing the waiver).

57. *See supra* notes 47–53 and accompanying text.

the benefit was "contrary to equity and good conscience." [58] A precondition to recovery based upon unjust enrichment is the lack of remedy by an action on the contract.[59]

■ Plaintiff has failed to establish at least some, if not all, of these elements as a matter of law. First, it is not clear that no recovery is available to plaintiff under the June 4 contract. Second, taking defendants' allegations as true, there well may be a remedy available to plaintiff for breach of the alleged June 16 oral agreement, which plaintiff has not even pleaded. Third, factual questions exist about whether defendants were enriched and whether "equity and good conscience" demand restitution. Plaintiff is free to prove these facts at trial, but in light of defendants' allegations, judgment as a matter of law is not warranted.

*Defendants' Counterclaims*

■ Plaintiff moves for summary judgment on the counterclaims based on the waiver of defenses and counterclaims in the June 4 note. As discussed above, defendants adequately have alleged novation, and therefore, it is not clear as a matter of law that the waiver applies. In consequence, summary judgment on this ground is inappropriate.

Plaintiff contends in the alternative that even if defendants' counterclaims are not precluded by the waiver, summary judgment nonetheless is appropriate because defendants violated Section 14–65j of the Connecticut General Statutes, which re-

quires any motor vehicle repair shop to obtain a written authorization signed by the customer before performing any repair work and either include in the authorization an estimate of maximum cost of parts and labor, or if an estimate is not available at the time the authorization is signed, provide an estimate to the customer prior to commencing the work and obtain the customer's written or oral consent, which then must be recorded on the invoice.[60]

Defendants do not allege that Schuster provided any written authorization before Dragone Classic commenced the repair work.[61] Further, although they contend that Schuster's oral consent was obtained before every repair, they do not allege that this consent ever was recorded on the invoice.[62] However, they contend that the statute does not apply to automobile restoration and repair businesses specializing in antique cars and that, in any event, Schuster waived application of the statute by virtue of the parties' long-standing practice of authorizing orally the repair work and not requiring a written record of Schuster's consent to the estimates.[63]

The first of these arguments borders on the frivolous. The statute defines "motor vehicle repair shop," the subject of Section 14–65j's written authorization requirement, as including any qualified person having a suitable place of business and equipment engaged in repairing *"any* motor vehicle," [64] and it is clear that "antique, rare or special interest" automobiles are considered "motor vehicles." [65] Defendants point out correctly that plaintiff has presented

**58.** *See, e.g., Meaney v. Connecticut Hosp. Assoc., Inc.,* 250 Conn. 500, 735 A.2d 813, 820 (1999); *Eastern Metal Prod., Inc. v. Deperry,* 44 Conn.App. 60, 686 A.2d 1003, 1004 (1997).

**59.** *See, e.g., Meaney,* 735 A.2d at 820; *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 649 A.2d 518, 522 (1994).

**60.** Conn. Gen.Stat. Ann. § 14–65j (West 2000).

**61.** Although defendants contend in their brief that there is an issue of fact regarding their

compliance with the statute, Def. Mem. at 34–35, they make no factual allegation that a written authorization as required under the statute was ever obtained.

**62.** E. Dragone Aff. ¶ 49.

**63.** Def. Mem. at 35–36.

**64.** Conn. Gen.Stat. Ann. §§ 14–51, 14–65e (italics added).

**65.** *Id.* § 14–1.

no case law or legislative history suggesting that Section 14–65j applies to restoration and repair businesses specializing in antique cars,[66] but it is not plaintiff's burden to do so, as the statute is clear.

 Defendants' waiver argument is more compelling. The statute expressly permits a customer to waive in writing the right to an estimate,[67] but does not mention waiver of either the initial written authorization or the recording of the customer's consent to the estimate. However, under Connecticut law, a party may waive a statutory right by voluntarily relinquishing it through manifestation of the intention to do so, either affirmatively or by acts and conduct inconsistent with the intention to exercise the right.[68] Defendants' allegations regarding the parties' prior course of dealing[69] certainly supports the conclusion that plaintiff, in failing to object to the lack of a written authorization or record of his consent to the estimates in the prior eight transactions, waived his right to both the authorization and the record of his consent under section 14–65j. In consequence, summary judgment on the counterclaims is inappropriate.[70]

### Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment on Counts I and II of the amended complaint and on defendants' counterclaims is denied.

SO ORDERED.

---

66. Def. Mem. at 36.

67. CONN. GEN.STAT. ANN. § 14–65g.

68. See, e.g., MacKay v. Aetna Life Ins. Co., 118 Conn. 538, 173 A. 783, 787 (1934); Soares v. Max Services, Inc., 42 Conn.App. 147, 679 A.2d 37, 51–52 (1996).

69. See supra notes 34–40 and accompanying text.

---

70. Plaintiff makes an argument also that the Court at least should grant summary judgment on the statutory theft counterclaim because Schuster holds no property of defendants and because "[d]efendants cannot seriously allege that Schuster intentionally deprived them of funds to which they were entitled." Pl. Mem. at 24. These are disputed issues of fact, and summary judgment therefore is inappropriate.