Myron J. SCHUSTER, Plaintiff,

v.

DRAGONE CLASSIC MOTOR CARS, INC., et al., Defendants.

No. 99 Civ. 2163 LAK.

United States District Court,
S.D. New York.

July 10, 2000.

Jeffrey R. Hellman, Gregory B. Schiller, Zeisler & Zeisler, P.C., Bridgeport, CT, Joseph R. Gagliardo, Jr., Squadron, Ellenoff, Plesent & Sheinfeld, LLP, New York, NY, for plaintiff.

Joseph W. Martini, Zachary R. Osborne, Pepe & Hazard LLP, Hartford, CT, for defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Myron Schuster is a collector of antique automobiles. He contends that defendant dealer, Dragone Classic Motor Cars ("Dragone Classic"), and its two principals, defendants Emanuel Dragone ("Dragone") and George Dragone, defrauded him in two separate transactions—the first, an alleged loan of $2,125,000, and the second, the purchase of a 1939 Bugatti Type 57. His claims include breach of contract based on the defendants' failure to repay the note, fraud, breach of fiduciary duty, unjust enrichment, and violation of the Connecticut Unfair Trade Practices Act. Defendants counterclaimed based on plaintiff's alleged failure to pay for repair and restoration services performed by defendants on four of plaintiff's automobiles. During the course of the trial, the parties settled all of their disputes relating to the 1939 Bugatti Type 57 and defendants' non-payment claims leaving only the dispute concerning the alleged $2,125,000 loan for resolution. This opinion embodies the Court's findings of fact and conclusions of law following trial.

### Facts

The general background of the dispute is fully set forth in the Court's opinion denying plaintiff's motion for summary judgment, familiarity with which is assumed.[1] Only the barest essentials need be noted here.

---

1. *Schuster v. Dragone Classic Motor Cars, Inc.,* 98 F.Supp.2d 441, 2000 WL 666384 (S.D.N.Y. May 23, 2000).

Dragone was seeking to acquire a number of antique automobiles from an Italian bankruptcy court. The financing was to come principally from a foreign investor, one Kogan, who allegedly was to have been a partner in Dragone's acquisition of the vehicles. At a critical juncture, however, Kogan was unable or reluctant to come up with the money as promptly as was required. Dragone approached Schuster for a $2,125,000 bridge loan. Schuster agreed to lend him the money on the condition that he receive a short wheelbase Ferrari California Spyder automobile, one of the vehicles to be acquired in Italy, at a very advantageous price in partial repayment of the loan, with the balance to be repaid in cash. He wired the money to Dragone's attorney on June 4, and the attorney promptly wired it on to Dragone's Italian contact. On June 7, Dragone, his brother George Dragone, and Dragone Classic executed and delivered to Schuster a promissory note in the principal amount of $2,125,000. Under the terms of the note, the obligors were obliged to pay Schuster $1,675,000 in cash on June 21. The balance of $450,000 was due on September 3, but the defendants agreed that they would transfer title and deliver the California Spyder to Schuster by that date, in which case Schuster would waive his right to payment of the balance.[2] So much is essentially undisputed, but the parties here part ways.

In mid June, Dragone learned that Kogan needed more time to come up with the money and claims that he contacted Schuster with a view to Schuster replacing Kogan in the deal. Schuster, according to Dragone, agreed, although Dragone was vague and inconsistent about the alleged terms of that agreement.

On direct, Dragone asserted that "Schuster agreed to stay in the deal if he could get more and better cars," thus implying that Schuster agreed to become a partner in rather than a lender to the venture. Schuster, according to Dragone, wanted "a total of three ... cars: the short-wheel base California Spyder, the short-wheel base Berlinetta steel body and the 500 Testarossa." Schuster allegedly said that he did not want his money back, he wanted the cars.[3]

But Dragone told a somewhat different story on cross-examination:

"Q. Mr. Dragone, you say had an agreement with Mr. Schuster that supersedes the original loan, correct? A. Correct.

Q. The agreement to that that you have was that Mr. Schuster was supposed to receive a Ferrari Testarosa and a Ferrari, the Ferrari California Spyder and the Berlinetta, correct? A. Correct.

Q. He was to receive nothing else, correct? A. Well, you see, the agreement was open-ended, and this has been the problem right along here. I agreed to give him a $200,000 discount on each one of these additional cars and if there was anything else there that he wanted, he was either going to supplement, put more money in, or receive just these cars and maybe get some money back. It was open-ended. None of us went into this deal having seen any of these cars. The cars were not looked at. We didn't know the exact values. We didn't know the exact condition."[4]

Indeed, he went on to say that the "deal" not only was "open-ended" but that "until the cars were inspected, that particular deal was not finalized, because it was an unknown to all of us...."[5]

---

**2.** Interestingly, the note is not signed by Schuster, so the source of his obligation to waive his right to payment of the balance upon delivery of the car is unclear. As Schuster does not dispute that obligation, however, the point is immaterial.

**3.** DX A (E.Dragone) ¶ 14.

**4.** Tr. at 283–84.

**5.** *Id.* at 285.

Schuster concurred in neither of these versions. He denied that he had reached any agreement with Dragone beyond the promissory note signed on June 4.[6]

Determination of where the truth lies here is rendered more difficult by the substantial problems with the credibility of both Schuster and Dragone. The two had done business in antique automobiles before, and the record clearly shows that they collaborated in preparing documents that falsely (and, in at least one case, dramatically) understated the prices of automobiles purchased by Schuster from Dragone which Schuster then filed with the Department of Motor Vehicles for the admitted purpose of defrauding state sales tax collection authorities.[7] One of Dragone's attorneys (not counsel in this case) substantially admitted at trial that he interposed a baseless counterclaim on Dragone's behalf in another lawsuit for the purpose of defeating an application for a prejudgment attachment,[8] and his denial that Dragone was aware of his actions was not credible. Nor was the demeanor of either Schuster or Dragone such as to give the Court confidence in the uncorroborated word of either of them. Nevertheless, taking all of the evidence into account, the Court finds as follows on this central issue.

When Dragone learned that Kogan was reluctant, unable or unwilling to come up with the necessary funds on schedule, Dragone did approach Schuster about "staying in the deal" rather than being repaid in strict conformity of the note.

Schuster agreed to defer payment on the note pending further developments in the transaction, and certainly discussed with Dragone the possibility that he would be repaid in automobiles rather than cash once the cars were received. But no definite agreement was reached in that regard, and Schuster certainly did not agree to become a partner or co-venturer in the deal or to convert his note into the equivalent of an equity contribution. The only "agreement" was that Schuster would not press for immediate payment of the note and would consider accepting all or a greater part of the repayment of the note than was provided therein in the form of automobiles, provided the parties could reach agreement on the specific automobiles and the values to be attributed to them for purposes of repaying the note.[9]

As things developed, the cars never arrived. It appears that the funds that Dragone put into the deal in Italy, including the money borrowed from Schuster, were stolen. Dragone has made substantial efforts to recover the money, but has been almost entirely unsuccessful to date. Stated in colloquial terms, the question is whether the loss falls entirely on Dragone because Schuster was simply a lender to him or whether, instead, Schuster must bear part of the loss as Dragone's partner.

## Discussion

■ The core issue in this case is whether Schuster and the defendants entered into a novation superseding the June 4 promissory note.[10] As the Court noted

6. PX 101 (Schuster) at 6–7.

7. Tr. at 110–15; DX 34.

8. Tr. at 238–51.

9. Dragone made a number of arguments in support of his contention that Schuster became his co-venturer based in part on circumstantial evidence of various types. The most notable was his assertion that his cancellation of Kogan's $2,125,000 note payable to Dragone in mid June is consistent only with Schuster's having agreed to replace Kogan in the deal. The Court, however, rejects that and all

of Dragone's other arguments. The cancellation of the Kogan note is consistent not only with Dragone's proffered explanation, but also with a desire to accede to the wishes of a rich and valuable customer, Schuster's agreement to defer immediate repayment of the note pending receipt of the cars coupled with the assumption that the Italian purchase would be completed, or both.

10. The Court has considered, and rejects, all of Schuster's other claims. There is no persuasive evidence that defendants induced Schuster to make the loan by fraud or are

in denying plaintiff's motion for summary judgment, "a novation requires (1) a previously valid obligation, (2) agreement of all parties to a new contract, (3) extinguishment of the old contract, and (4) a legally valid new contract."[11] Having now heard the evidence, the Court finds that these requirements are not all satisfied. The only agreement was that Schuster would not insist on immediate repayment and would discuss taking automobiles in repayment in the event the automobiles were obtained. There was no agreement to extinguish the note.

### Conclusion

For the foregoing reasons, plaintiff shall recover from defendants, jointly and severally, the sum of $2,125,000 together with interest on (a) $1,675,000 at the prime rate plus one percent, and (b) $450,000 at the statutory rate of nine percent, in each case from the date of commencement of this action to the date of judgment, together with the taxable costs of this action and reasonable attorneys' fees to be fixed on motion.[12]

SO ORDERED.

liable to him on any basis other than that discussed in the text.

11. *Schuster*, 98 F.Supp.2d at 446 (citing *In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82–83 (2d Cir.1996); *Wasserstrom v. Interstate Litho Corp.*, 114 A.D.2d 952, 954, 495 N.Y.S.2d 217, 219 (2d Dept.1985)).

12. The note specifies the rate of interest on the $1,675,000 and provides for the recovery of attorney's fees. PX 1. The Court fixes the date of default as the date on which the action was filed for want of other evidence of the date on which the plaintiff demanded payment.