No. 2--07--0661          Filed: 6-30-08

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| TODD MONTGOMERY, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 02--L--293 |
| | ) | |
| NOSTALGIA LANE, INC., | ) | |
| | ) | |
| Defendant-Appellee | ) | |
| | ) | |
| (Roger Merrill, Individually and as Chairman | ) | |
| of the Board and Treasurer, and Mike Furth, | ) | Honorable |
| Individually and as General Manager, | ) | Janet R. Holmgren, |
| Defendants). | ) | Judge, Presiding. |

_____

JUSTICE BYRNE delivered the opinion of the court:

Plaintiff, Todd Montgomery, contacted defendant, Nostalgia Lane, Inc., to restore his 1970 Plymouth Roadrunner. Defendant inspected the vehicle and provided plaintiff a written estimate that the project was expected to cost $35,000 but that the final bill would reflect the actual cost of parts and labor. Plaintiff agreed to the project and paid installments amounting to $33,500, but defendant deviated from the estimated cost. Plaintiff paid defendant the outstanding balance of $5,899 to retrieve the vehicle, and this dispute ensued. Plaintiff filed a six-count, third-amended complaint, and the parties filed opposing motions for summary judgment. The trial court ruled for defendant on all of the counts, and plaintiff appeals.

On appeal, plaintiff argues that the trial court committed reversible error in granting defendant summary judgment on count I of the third-amended complaint. However, count I is unfocused in that it alleges several statutory claims. Count I alleges that defendant violated several provisions of the Automotive Repair Act (815 ILCS 306/1 et seq. (West 2006)) and that those violations are actionable under section 2Z of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2Z (West 2006)). Count I also alleges a more general claim of fraud under section 2 of the Consumer Fraud Act in that defendant prepared a "low-ball" estimate to lure plaintiff into the transaction, intending to extract more money from plaintiff after the car was disassembled. 815 ILCS 505/2 (West 2006). Plaintiff abandons his remaining claims.

We agree with plaintiff that the trial court committed reversible error in entering summary judgment for defendant on count I. We reverse the judgment and remand the cause for proceedings consistent with this opinion.

FACTS

Some facts are undisputed. When plaintiff purchased the car in 1989, it could not be driven. Plaintiff initially contacted defendant in May 1998 to inquire about fixing it. In the spring of 1999, Roger Merrill and Mike Furth, defendant's chairman and general manager, respectively, viewed the car. Plaintiff told Merrill and Furth that he wanted the car to be "mechanically perfect" and "wouldn't mind if it looked nice, too," but plaintiff also said that his budget was limited to $20,000 to $25,000.

On May 12, 1999, defendant gave plaintiff a written estimate for the restoration project. Defendant estimated the cost of parts and labor to be $35,000, with a notation that "all jobs [will be]

ultimately billed as time, materials, labor + parts[;] estimates may change + or -." Plaintiff was to make progress payments of $3,500 every two weeks. At his deposition, plaintiff testified that Furth privately assured him that the project would not cost more than $35,000. However, plaintiff admitted that he was informed "right up front" that defendant would charge labor costs at $42 per hour.

In September 1999, defendant took possession of the car. Plaintiff periodically went to the shop to observe the progress, and he never objected to the quality of the workmanship. Plaintiff made progress payments amounting to $33,500, but cost overruns caused the total bill to surpass the $35,000 estimate.

On August 3, 2000, defendant sent plaintiff a letter demanding a progress payment of $3,500 to be applied to the outstanding balance of $5,899. Defendant's letter stated that the work would resume as soon as plaintiff made the progress payment but that plaintiff could take possession of the car only if he paid the outstanding balance in full. Defendant wrote that "a worst case scenario for completion of your vehicle would be in the $20,000 to $25,000 range." Defendant reported that 643 hours of labor charges had accrued and that "[t]he average for a total restoration is 900-1,000" hours.

In early December 2000, plaintiff paid the outstanding balance of $5,899 and took possession of the car. Plaintiff stored the car for several months before towing it to another shop, where the project was completed. The new shop did not provide an estimate for finishing the project, but plaintiff initially agreed to pay $26,500 for labor. Using a parts list provided by defendant, plaintiff purchased all of the remaining parts himself for about $12,000. Plaintiff eventually paid the new shop $31,416 for the labor, which meant that plaintiff spent an additional $43,416 to complete the project after he reclaimed the car from defendant.

On January 7, 2004, plaintiff filed his third-amended complaint, in which he alleged that defendant knowingly gave him a "grossly inadequate, 'low-ball' estimate" to induce plaintiff to hire defendant for the restoration project. Plaintiff alleged that Merrill and Furth knew, before starting the project, that the $35,000 estimate would not cover even the $42-per-hour labor costs, considering the car's "rough" condition. Merrill and Further gave the "unrealistic" estimate to lure plaintiff into the transaction, intending to extract more money once the car was disassembled. Plaintiff alleged that he relied on defendant's expertise in the field as well as Furth's oral assurances that the amount billed would not exceed the estimate.

Based on the factual allegations, plaintiff claimed several violations of the Automotive Repair Act and the Consumer Fraud Act. Section 2Z of the Consumer Fraud Act provides that "[a]ny person who knowingly violates the Automotive Repair Act *** commits an unlawful practice within the meaning of this Act." 815 ILCS 505/2Z (West 2006).

If an automotive project falls within the scope of the Automotive Repair Act, the motor vehicle repair facility must give the consumer a written estimated price for labor and parts for a specific repair and shall not charge for work done or parts supplied in an amount that exceeds the estimate by more than 10% without oral or written consent of the consumer. 815 ILCS 306/15(b), 20 (West 2006). Plaintiff alleges that the Automotive Repair Act applies in this case and that defendant violated sections 15(b) and 20, among others.

Section 10 of the Automotive Repair Act prescribes the types of repairs and repair facilities that are governed by the statute's regulatory provisions. Section 10 defines various terms and provides as follows:

" 'Automotive repair' includes, but is not limited to:

(1) All repairs to motor vehicles that are commonly performed in a motor vehicle repair facility by a motor vehicle technician, including the diagnosis, installation, exchange, or repair of mechanical or electrical parts or units for any vehicle, the performance of any electrical or mechanical adjustment to any vehicle, or the performance of any service work required for routine maintenance or repair of any vehicle. The term does not include commercial fleet repair or maintenance transactions involving 2 or more vehicles or ongoing service or maintenance contracts involving vehicles used primarily for business purposes.

(2) All repair work in motor vehicle repair facilities that perform one or more specialties within the automotive repair service industry, including, but not limited to, refinishing, brake, electrical, exhaust repair or installation, front-end, radiators, tires, transmission, tune-up, and windshield. However, transactions involving the retail purchase of merchandise when a facility installs the merchandise as part of the transaction at the discretion of the customer for a firm price are not included. These transactions shall include but not be limited to tires, batteries, oil, and lube jobs.

'Automotive repair facility' or 'motor vehicle repair facility' means any person, firm, association, or corporation that for compensation engages in the business of automotive repair or diagnosis, or both, of malfunctions of motor vehicles." 815 ILCS 306/10 (West 2006).

The parties debated in the trial court, as they do on appeal, whether the Plymouth Roadrunner project was an "automotive repair" and whether defendant qualifies as an "automotive repair facility" or a "motor vehicle repair facility" under section 10 of the Automotive Repair Act. Plaintiff's position is that the project was an "automotive repair" and that defendant qualifies as an "automotive repair facility" or "motor vehicle repair facility," and, therefore, defendant's alleged noncompliance with the regulatory provisions of the Automotive Repair Act entitles plaintiff to summary judgment. Defendant, predictably, takes the opposite view.

Several of plaintiff's claims were dismissed or withdrawn before the trial court entered the May 30, 2007, order from which this appeal is taken. In the May 30, 2007, order, the court granted defendant summary judgment on count I. The court agreed with defendant's position that "the business of completely dismantling and restoring collector cars is not the type of 'automotive repairs' that are covered by the [Automotive Repair] Act and that the defendant's business facility is not the type of 'motor vehicle repair facility' or 'automotive repair facility' that is defined under the [Automotive Repair] Act."

The court held that "[t]here is a commonsense, qualitative distinction between a facility that specializes in the restoration of unique, vintage automobiles and an automobile repair shop that does everyday repairs on various makes and models of vehicles on a volume basis." The court also emphasized evidence that the availability and prices of parts for vintage cars fluctuate, thereby affecting the cost of a restoration project. The court opined that the Automotive Repair Act applies only to "malfunctioning" vehicles and not to "non-functional" vehicles, like plaintiff's car.

The court dismissed count I in its entirety, but the written ruling did not address plaintiff's claim that defendant committed consumer fraud under section 2 of the Consumer Fraud Act.

However, the court found that defendant was entitled to summary judgment on count II, which alleged common-law fraud. As to count II, the court did "not believe that there is a genuine issue of material fact as to whether there was any deception involved in the preparation of the original estimate or the estimate of what the remaining restoration charges would be." The court noted that the estimate that was on file showed that defendant would bill the actual cost of time and materials rather than a set charge. Plaintiff's timely appeal followed.

ANALYSIS

On appeal, plaintiff argues that the trial court committed reversible error in granting defendant summary judgment on count I of the third-amended complaint, which actually contains two claims. First, plaintiff argues that the trial court erred in granting defendant summary judgment on the claim filed under the Automotive Repair Act and section 2Z of the Consumer Fraud Act. In his brief, plaintiff argued that he is entitled to summary judgment or, alternatively, to a trial on that claim. However, during oral argument, plaintiff requested only that he be granted a trial on the claim filed under the Automotive Repair Act.

Second, plaintiff argues that a genuine issue of material fact precludes the entry of summary judgment on his claim of consumer fraud under section 2 of the Consumer Fraud Act. Thus, plaintiff argues that he is entitled to a trial on that claim as well. Plaintiff abandons his remaining claims by failing to argue them here. See 210 Ill. 2d R. 341(h)(7) ("Points not argued [in the appellant's opening brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

A. Standard of Review

The purpose of a summary judgment proceeding is not to try an issue of fact but, rather, to determine whether one exists. Mydlach v. DaimlerChrysler Corp., 226 Ill. 2d 307, 311 (2007); Ferguson v. McKenzie, 202 Ill. 2d 304, 307-08 (2001). Summary judgment is proper when "[t]he pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2--1005(c) (West 2006); Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 102 (1992). Because summary judgment is a drastic measure, it should be allowed only " 'when the right of the moving party is clear and free from doubt.' " Mydlach, 226 Ill. 2d at 311, quoting Purtill v. Hess, 111 Ill. 2d 229, 240 (1986).

A trial court's entry of summary judgment is subject to de novo review. General Agents Insurance Co. of America, Inc. v. Midwest Sporting Goods Co., 215 Ill. 2d 146, 153 (2005). When reviewing the disposition of a summary judgment motion, this court construes all evidence strictly against the movant and liberally in favor of the nonmoving party. Forsythe v. Clark USA, Inc., 224 Ill. 2d 274, 280 (2007). "If the undisputed material facts could lead reasonable observers to divergent inferences, or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." Forsythe, 224 Ill. 2d at 280.

### B. Automotive Repair Act

Plaintiff challenges the trial court's conclusion that the business of completely dismantling and restoring collector automobiles, like the 1970 Plymouth Roadrunner, is not the type of "automotive repair" that is covered by section 10 of the Automotive Repair Act. Plaintiff's brief asserts that (1) the Automotive Repair Act applies to his restoration project; (2) there is no genuine issue of material fact that defendant failed to comply with the Automotive Repair Act; and (3) if a

factual question regarding compliance exists, summary judgment for defendant is inappropriate. The trial court granted defendant summary judgment based on its belief that the Automotive Repair Act does not apply, and, therefore, the court did not reach the second or third issue.

To address plaintiff's argument, we must construe the Automotive Repair Act. Our review is de novo. Illinois Department of Healthcare & Family Services v. Warner, 227 Ill. 2d 223, 229 (2008). The primary objective in interpreting a statute is to give effect to the intent of the legislature. Harshman v. DePhillips, 218 Ill. 2d 482, 493 (2006). The most reliable indicator of the legislature's intent is the language of the statute, which is given its plain, ordinary, and popularly understood meaning. In re Detention of Lieberman, 201 Ill. 2d 300, 308 (2002). "We read the statute as a whole, considering all relevant parts." Harshman, 218 Ill. 2d at 493.

Defendant argues that its business is not regulated by the Automotive Repair Act, because it is not an "automotive repair facility" or "motor vehicle repair facility" as defined by section 10. Section 10 uses the terms "automotive repair facility" and "motor vehicle repair facility" interchangeably. The section provides, in relevant part, as follows:

"'Automotive repair facility' or 'motor vehicle repair facility' means any person, firm, association, or corporation that for compensation engages in the business of automotive repair or diagnosis, or both, of malfunctions of motor vehicles." 815 ILCS 306/10 (West 2006).

Defendant does not dispute that it is a "firm, association, or corporation" that services cars for compensation. However, defendant argues that it engages in "the complete dismantling and ultimate restoration of vintage motor vehicles," and, therefore, it is not in the business of

"automotive repair or diagnosis, or both, of malfunctions of motor vehicles." 815 ILCS 306/10 (West 2006). We disagree.

### 1. "Automotive Repair"

We conclude that the term "automotive repair" encompasses the restoration of a vintage car to or near its original state. Section 10 of the Automotive Repair Act defines "automotive repair" as follows:

" 'Automotive repair' includes, but is not limited to:

(1) All repairs to motor vehicles that are commonly performed in a motor vehicle repair facility by a motor vehicle technician, including the diagnosis, installation, exchange, or repair of mechanical or electrical parts or units for any vehicle, the performance of any electrical or mechanical adjustment to any vehicle, or the performance of any service work required for routine maintenance or repair of any vehicle. The term does not include commercial fleet repair or maintenance transactions involving 2 or more vehicles or ongoing service or maintenance contracts involving vehicles used primarily for business purposes.

(2) All repair work in motor vehicle repair facilities that perform one or more specialties within the automotive repair service industry, including, but not limited to, refinishing, brake, electrical, exhaust repair or installation, front-end, radiators, tires, transmission, tune-up, and windshield. However, transactions involving the retail purchase of merchandise when a facility installs the merchandise as part of the

transaction at the discretion of the customer for a firm price are not included. These transactions shall include but not be limited to tires, batteries, oil, and lube jobs." 815 ILCS 306/10 (West 2006).

The General Assembly's use of the broad phrases "all repairs" and "all repair work" in defining "automotive repairs" leads us to conclude that vintage car restoration projects are included in the definition in section 10. Our conclusion is supported by several guides of statutory interpretation.

When determining the plain and ordinary meaning of words, a court may look to the dictionary (Madison Mutual Insurance Co. v. Kessler, 376 Ill. App. 3d 1121, 1128 (2007)), and so we compare the meanings of "repair" and "restore." Webster's dictionary defines "repair" as "to restore by replacing a part or putting together what is torn or broken" and "to restore to a sound or healthy state." (Emphasis added.) Webster's Third New International Dictionary 1923 (1986). Webster's dictionary similarly defines "restore" as "to bring back to or put back into a former or original state" and "to repair and alter (a building) with the aim of putting back into the original form." (Emphasis added.) Webster's Third New International Dictionary 1936 (1986). Thus, the plain, ordinary, and popularly understood meanings of "repair" and "restore" show that the terms are essentially synonymous.

Defendant points out that the examples of "automotive repairs" in section 10 include "the diagnosis, installation, exchange, or repair of mechanical or electrical parts or units for any vehicle, the performance of any electrical or mechanical adjustment to any vehicle, or the performance of any service work required for routine maintenance or repair of any vehicle." 815 ILCS 306/10 (West

2006). Defendant argues that these services differ from its practice of "the complete dismantling and restoration of an entire vehicle." We view the distinction as strained, at best.

For instance, the Automotive Repair Act specifically contemplates the complete dismantling of a vehicle, regardless of its age or state of disrepair. Section 15, which prescribes mandatory disclosures to the consumer, provides that, "[i]f it is necessary to disassemble, or partially disassemble, a vehicle or vehicle component in order to provide the consumer with a written estimate for required repair or maintenance, the estimate shall show the cost of any disassembly or reassembly, or both, if the consumer elects not to proceed with the repair or maintenance of the vehicle." 815 ILCS 306/15(b)(4) (West 2006). Thus, section 15 requires an estimate to disclose disassembly costs when the diagnosis requires that the entire car be taken apart, which is precisely what defendant does in performing its service. Furthermore, defendant's written estimate stated that defendant would address the "engine, trans[mission], drive train, interior, body," and would "detail and color all items correctly, replace + restore all trim." One can hardly imagine how these tasks do not amount to "automotive repair."

Our interpretation is further supported by the exclusion of various types of repairs from the definition of "automotive repair." First, section 10(1) provides that "[t]he term does not include commercial fleet repair or maintenance transactions involving 2 or more vehicles or ongoing service or maintenance contracts involving vehicles used primarily for business purposes." 815 ILCS 306/10(1) (West 2006). Second, section 10(2) excludes "transactions involving the retail purchase of merchandise when a facility installs the merchandise as part of the transaction at the discretion of the customer for a firm price," such as transactions involving tires, batteries, oil, and lube jobs. 815 ILCS 306/10(2) (West 2006). Third, section 83 provides that the Automotive Repair Act "does

not apply to automotive collision and body repair facilities as defined in the Automotive Collision Repair Act [(815 ILCS 308/1 et seq. (West 2006))]." 815 ILCS 306/83 (West 2006).

These provisions show that the General Assembly considered different types of repair projects and intended that the Automotive Repair Act would not apply to fleets, business vehicles, the installation of certain small merchandise, and statutorily defined collision repairs. The General Assembly had the opportunity to exclude vintage car restoration projects and declined to do so.

Defendant next argues that, because it provides a type of "one-stop-shopping" for an entire vehicle restoration, it is not a "specialist" in the automotive repair service industry as that term is used in section 10. However, section 10 specifically states that "automotive repair" includes "all repair work in motor vehicle repair facilities that perform one or more specialities." (Emphasis added.) 815 ILCS 306/10 (West 2006). The "one or more specialties" provision of section 10 shows that the General Assembly intended that the Automotive Repair Act should apply to facilities even if their breadth of services is quantitatively different. Defendant's position that its business should be excluded as qualitatively unique is undermined by the absence of any provision suggesting that meticulously performed services are not "automotive repairs." Defendant does not escape the application of the Automotive Repair Act simply because it performs more than one specialty within the field and performs these services meticulously.

In fact, a review of section 5 shows why an automotive repair facility like defendant, which provides a broad spectrum of services, should be governed by the Automotive Repair Act. Section 5 provides as follows:

> "The automotive repair industry supports good communication between motor vehicle repair facilities and their customers. The General Assembly recognizes that

improved communications and accurate representations between automotive repair facilities and their customers will increase consumer confidence, reduce the likelihood of disputes arising, and promote fair and nondeceptive practices, thereby enhancing the safety and reliability of motor vehicles serviced by motor vehicle repair facilities in the State of Illinois." 815 ILCS 306/5 (West 2006).

A complete vehicle restoration project is generally much more complex and expensive than a garden-variety car repair. Often, a consumer seeking a restoration insists on meticulous attention to detail and is willing to pay handsomely for it. The increased complexity and expense inherent in these projects creates an even greater need for good communication and accurate representations between automotive repair facilities and their customers. In other words, the bigger the project, the greater the interest in reducing the likelihood of disputes and in promoting fair and nondeceptive practices.

The General Assembly recognized that smaller transactions do not compel regulation. As mentioned, section 10 excludes "transactions involving the retail purchase of merchandise when a facility installs the merchandise as part of the transaction at the discretion of the customer for a firm price," such as those involving tires, batteries, oil, and lube jobs. 815 ILCS 306/10 (West 2006). Adopting defendant's position would lead to an absurd result: a consumer seeking a new muffler would be protected by the statute, while a consumer like plaintiff seeking the complete restoration of a rare vehicle would be left unprotected.

Defendant also takes the unseemly tack of trivializing plaintiff's interest in his car. Noting that plaintiff had "the goal of driving [the Plymouth Roadrunner] as a second car, for fun," defendant argues that "the ordinary consumer relies upon his or her car to assist in meeting basic needs" and

that "[i]t is not necessary for an ordinary consumer to have a suped-up vintage hot rod to meet the needs of his or her family." Defendant implies that a consumer like plaintiff who uses his vehicle for recreation is somehow less worthy of consumer protection than a person who uses his vehicle for basic transportation. The General Assembly never intended value judgments when it enacted the Automotive Repair Act, and we will not create an artificial distinction here. See In re Marriage of Beyer, 324 Ill. App. 3d 305, 309-10 (2001) (a court may not supply omissions, remedy defects, substitute different provisions, add exceptions, limitations, or conditions, or otherwise change the law so as to depart from the plain meaning of the statutory language).

Defendant advocates the trial court's opinion that the availability and prices of parts for vintage cars can fluctuate, thereby affecting the cost of a restoration project and making it difficult to estimate the cost. According to defendant, the difficulty in estimating these uncertain costs makes it unfair to apply the Automotive Repair Act to the restoration of vintage cars. However, the General Assembly contemplated this contingency in section 25, which provides that, "[i]f it is determined that the estimated price is insufficient because of unforeseen circumstances, the consumer's consent must be obtained before the work estimated is done or parts estimated are supplied." 815 ILCS 306/25 (West 2006). The unavailability of parts or special tools is precisely the type of "unforeseen circumstance" that would require an automotive repair facility to consult with the consumer before increasing the bill.

### 2. "Malfunctions of Motor Vehicles"

Next, we disagree with defendant's position that the services it performed did not address "malfunctions" of plaintiff's motor vehicle. Emphasizing that the car could not be driven when the project began, defendant echoes the trial court's distinction between "malfunctioning" vehicles and

"non-functioning" vehicles. Defendant suggests that only malfunctioning vehicles are governed by the Automotive Repair Act because section 10 declares that an "[a]utomotive repair facility" and a "motor vehicle repair facility" engage in the business of "automotive repair or diagnosis, or both, of malfunctions of motor vehicles." (Emphasis added.) 815 ILCS 306/10 (West 2006).

A review of the plain, ordinary, popularly understood meanings of "malfunction" and "nonfunctional" shows that the terms are indistinguishable for purposes of section 10. Webster's dictionary defines the term "malfunction" as "to function badly or imperfectly" or "fail to operate in the normal or usual manner." Webster's Third New International Dictionary 1367 (1986). Webster's dictionary similarly defines "nonfunctional" as "not performing or able to perform its regular function." Webster's Third New International Dictionary 1537 (1986).

Plaintiff persuasively argues that any distinction between "malfunctioning" and "nonfunctional" vehicles would lead to an absurd and arbitrary result. If nonfunctional vehicles were excluded from the types governed by the Automotive Repair Act, any car--regardless of year, make, or model--would not be covered if it had to be towed to the repair shop. Conversely, any car that could be driven would be covered. Certainly the General Assembly did not intend such an arbitrary distinction.

Defendant argues that its business activities are to "take old collector cars and completely rebuild and reconstruct them to their original--or better than original ('suped-up')--form." Defendant hints at an interesting issue: whether an automotive project that improves a car--rather than simply repairs or restores it to its original condition--is an "automotive repair" under section 10. One could conceive of a project that replaces functioning equipment with aftermarket merchandise to transform a car into something that the vehicle's manufacturer did not intend. Depending on the project, one

could argue that such a transformation does not qualify as an "automotive repair" under section 10. However, other than a vague reference to making plaintiff's car "better than new," there is no evidence that the Plymouth Roadrunner project involved "suping up" the car to anything beyond its original state. Thus, we need not comment on the issue of improvements here.

### 3. Factual Issue Precluding Summary Judgment

The trial court's decision that the Automotive Repair Act does not apply to plaintiff's vintage car restoration project obviated the need for the court to address plaintiff's argument that defendant failed to comply with the disclosure provision of section 15, the notice provision of section 20, the authorization provision of section 30, and the lien provision of section 75 of the Automotive Repair Act. Section 80(10) of the Automotive Repair Act provides that noncompliance with these sections is unlawful, and section 2Z of the Consumer Fraud Act provides that "[a]ny person who knowingly violates the Automotive Repair Act *** commits an unlawful practice within the meaning of this Act." 815 ILCS 505/2Z (West 2006).

In his brief, plaintiff does not take a firm position on whether he should receive summary judgment or a trial on the merits. Plaintiff argues that "the trial court committed reversible error in granting defendant's motion for summary judgment and denying plaintiff's motion for partial summary judgment." This statement is construed most accurately as a request for a remand for the entry of summary judgment for plaintiff. Such an interpretation is consistent with the conclusion section of plaintiff's reply brief, which argues that the trial court erred "in denying [plaintiff's] Motion for Summary Judgment." However, during oral argument, plaintiff argued that a trial on the merits is the proper remedy for the erroneous summary judgment entered for defendant, and therefore, we need not consider whether plaintiff is entitled to summary judgment.

C. Consumer Fraud Act

Plaintiff also argues that the existence of a factual issue precludes the entry of summary judgment on the second part of count I, in which he alleged a violation of section 2 of the Consumer Fraud Act. Section 2 provides as follows:

"[U]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact *** are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2 (West 2006).

To establish a violation of the Consumer Fraud Act, a plaintiff must prove "(1) a deceptive act or practice, (2) intent on the defendant['s] part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce." Siegel v. Levy Organization Development Co., 153 Ill. 2d 534, 542 (1992). Plaintiff alleges that defendant's "low-ball" estimate of the project's cost was a deceptive act occurring in the course of business, which was intended to lure plaintiff into the transaction. Plaintiff alleges that defendant used a "bait-and-switch" tactic whereby defendant would disassemble the car, complete some repairs, and then extract more money from plaintiff when it would be very inconvenient and expensive to discontinue the project.

In granting defendant summary judgment on count I, the trial court did not comment on the claim filed under section 2 of the Consumer Fraud Act. However, the trial court granted defendant summary judgment on plaintiff's common-law fraud claim, opining that it did "not believe that there

is a genuine issue of material fact as to whether there was any deception involved in the preparation of the original estimate or the estimate of what the remaining restoration charges would be."

Plaintiff stated in his affidavit that he would have objected to the estimate if he had known the project would require 900 to 1,000 hours of labor billed at $42 per hour, which would cost at least $37,800, without accounting for the parts. Plaintiff also asserted that Furth made multiple oral assurances that the project would stay below the estimated cost.

The court's conclusion that there was no deception is faulty because it is essentially a credibility determination that disregards the evidence favorable to plaintiff. See SBC Holdings, Inc. v. Travelers Casualty & Surety Co., 374 Ill. App. 3d 1, 8 (2007) (" 'Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file, when taken together in the light most favorable to the nonmovant, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law' [Citation]"). While defendant might ultimately prevail on the claim under section 2 of the Consumer Fraud Act, plaintiff's claim should not be decided in summary judgment proceedings.

CONCLUSION

First, we hold that the Automotive Repair Act governs plaintiff's project to restore his vintage collector car. The plain, ordinary, popularly understood meaning of the statutory language indicates the General Assembly's intent to protect consumers obtaining "automobile repairs," regardless of the complexity or expense of the project. Second, we hold that a genuine issue of material fact regarding the parties' dealings also precludes summary judgment on the claim under section 2 of the Consumer Fraud Act.

At oral argument, plaintiff took the position that the proper remedy is a trial on the merits of count I. Defendant argues that, if the Automotive Repair Act applies, any violation was de minimis, and therefore not actionable. On remand, the trial court will have the opportunity to sort out these issues and parse the multiple claims contained in count I.

For the preceding reasons, the judgment of the circuit court of Winnebago County is reversed, and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

McLAREN and BOWMAN, JJ., concur.