# IN THE COURT OF APPEALS OF IOWA

No. 19-0875
Filed August 19, 2020

**AL POLLER and DEB POLLER,**
　　　Plaintiffs-Appellants,

**vs.**

**OKOBOJI CLASSIC CARS, LLC,**
　　　Defendant-Appellee.
_____

　　　Appeal from the Iowa District Court for Dickinson County, Don E. Courtney, Judge.

　　　Plaintiffs appeal the decision of the district court finding defendant did not violate Iowa Code chapter 537B (2016) and that plaintiffs were in breach of contract. **AFFIRMED.**

　　　Matthew G. Sease of Sease & Wadding, Des Moines, for appellants.

　　　John R. Walker, Jr. and Jordan M. Talsma of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellee.

　　　Considered by Vaitheswaran, P.J., and Mullins and Ahlers, JJ.

**PER CURIAM.**

Al and Deb Poller wanted to restore a 1931 Chevrolet. They shipped the partially disassembled vehicle from New Jersey, where they lived, to Okoboji Classic Cars, LLC (OCC) in Iowa, where Deb grew up.

OCC did not give the Pollers an estimate of the total cost of the restoration work, as requested. However, OCC did provide an hourly rate and agreed to do the restoration work on a time-and-materials basis at that hourly rate, resulting in charges totaling $112,396.15. The Pollers declined to pay the entire amount and sued the company, alleging violations of the Motor Vehicle Service Trade Practices Act, Iowa Code chapter 537B (2016). OCC counterclaimed for breach of contract. The district court found no violations of chapter 537B and concluded the Pollers breached their contract with OCC by only paying $45,000 toward the outstanding balance. The court entered judgment in favor of OCC for $67,396.15, plus interest.

On appeal, the Pollers argue the district court erred in (1) refusing to find violations of chapter 537B and (2) concluding OCC proved its breach-of-contract claim. "In a law action tried to the court, our review is for the correction of errors at law, and the district court's findings of fact are binding on us if they are supported by substantial evidence." *Wolf v. Wolf*, 690 N.W.2d 887, 892 (Iowa 2005).

## I.    *Iowa Code chapter 537B*

Chapter 537B prescribes certain "trade practices" and prohibits "deceptive act[s] or practice[s]" by "supplier[s]" who repair or service motor vehicles for "consumer[s]." Iowa Code §§ 537B.3, 537B.6. A "consumer" is defined as "a person contracting for, or intending to contract for, repairs or service upon a motor vehicle used primarily for farm or personal use." *Id.* § 537B.2(1). A "supplier" is

defined as "a person offering to contract for repairs or service upon a motor vehicle." *Id.* § 537B.2(3). A "motor vehicle" means a "vehicle which is self-propelled and not operated upon rails," "which is subject to registration." *Id.* § 537B.2(2) (incorporating definition set forth in Iowa Code section 321.1). The Iowa Consumer Fraud Act creates a private right of action for violations of chapter 537B and authorizes actual and treble damages as well as attorney fees. *See id.* §§ 714.16(2)(k), 714H.3(1)(f); *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 31 n.8 (Iowa 2013) (citing Iowa Code section 537B.6 among the statutes that "incorporate the remedies provision of the [Consumer Fraud Act]").

As a preliminary matter, OCC argues that chapter 537B does not apply "due to the nature of the work it performs." Specifically, OCC asserts vehicle restoration differs from vehicle repair. OCC raised the issue in a pretrial motion but did not pursue it at trial or in a post-trial motion. The district court did not decide the issue. Based on these omissions, the Pollers assert error was not preserved. OCC responds that we are authorized to affirm the district court's ruling on this alternate ground. *See DeVoss v. State*, 648 N.W.2d 56, 61 (Iowa 2002) ("We have in a number of cases upheld a district court ruling on a ground other than the one upon which the district court relied *provided* the ground was urged in that court."). We assume without deciding that the chapter applies to a vehicle restoration shop and to a partially disassembled vehicle. With that assumption in mind, we turn to the district court's fact findings.

The court pertinently found that "[i]n July of 2013, while visiting family in the area . . . Deb [Poller] inquired as to the potential costs" of completing "the restoration of their '31 Chevy." Deb "was told that it was OCC's policy not to give

estimates or quotes regarding restoration projects because the uniqueness of each project, with its own variables and unknown conditions, [made it] impossible to give usefully accurate estimates." "A few months after returning to New Jersey, the Plaintiffs decided to have OCC restore their '31 Chevy."

"On November 6, 2013, Deb sent an email to [OCC] stating that their '31 Chevy was ready to ship but stipulated that it was conditioned upon OCC giving her a quote." OCC responded by noting it "could not give an estimate as to the total cost of her restoration project because of the nature of restoration projects in general[], and specifically because he was not familiar with the condition of the [Pollers'] '31 Chevy or their expectations of the restoration, which would be determined on an ongoing basis by the [Pollers]." OCC offered to restore the car "on a 'time and materials' basis," at "$65 per hour for OCC's shop time and expenses for parts and other services." "Deb shipped" the vehicle after receiving that email. OCC followed up by confirming receipt of the car and an expected completion time of one and one-half to two years. Deb responded, "NO WAY!!! Talk to [the office manager], I have been on the schedule since summer." OCC apologized for the confusion, described the time frames as "worst case scenarios," and stated they were "willing to schedule [the] car in now." The company manager stated:

> If we proceed we will need to get a game plan together as to what work you want us to do. We will continue to stay in touch by e-mail to send pictures, ask questions and receive your ideas and plans. The information that we need is very important. We will need to know if you want it completely stock, what color, what interior, what work you want done to the engine, etc.

Deb responded by stating they would "be in Okoboji between Christmas and New Years" and would "see [him] in person at that time." She continued, "Sound good? Thank you very much for the push."

At the December 2013 in-person meeting, the Pollers disclosed that they wanted OCC "to restore" the vehicle "to its original condition, with various modifications to the paint color and the implementation of a stereo." Deb offered a down payment of $10,000. The office manager explained OCC had never taken a down payment before but she would accept it. "Additionally, [the office manager] indicated to Deb that OCC would be providing monthly invoices to the [Pollers] so they could track the costs of the project." Al said "he was told the car would cost between $35,000–$40,000, maybe an additional $5000–$10,000 depending on what customized changes they made."

"On January 4, 2014, [OCC] notified the [Pollers] that OCC would begin disassembling the engine next week because he had found a business in South Dakota that would work on the engine and ship it back to OCC a couple of weeks later which would allow OCC to start rebuilding the engine." There was subsequent communication about parts. There was further communication about progress on the vehicle.

In the summer of 2014, "Deb visited OCC to check on the progress of the '31 Chevy. At the time of this meeting, OCC had not provided any invoices to the [Pollers] or given any update as to the costs spent up to that date."

"Shortly after the visit," OCC sent an email asking the Pollers for additional money. "Al replied on August 5, 2014, contending that they never received any monthly bills from OCC. Al explained that when they paid the $10,000 they were

told they would be getting monthly invoices. Al asked that they send invoices so everyone can be on the same game plan." Six invoices were sent to the Pollers. The district court stated:

> According to these invoices, after OCC had used the $10,000.00 initial down payment, the [Pollers] owed an additional $39,560.27. The [Pollers] requested itemization of all the work that had been done and a breakdown of the costs for the work that had been performed. Before this request was completed, OCC sent another invoice at the end of August indicating that over $25,000 worth of work had been completed since the August 6, 2014 invoices were submitted. The [Pollers] made the following payments by check to OCC: $10,000.00 on December 27, 2013, $15,000.00 on September 11, 2014; $10,000.00 on October 6, 2014; and $10,000.00 on November 13, 2014. At the time the Plaintiffs made their final payment, OCC was requesting an additional $50,694.93. By December 31, 2014, the [Pollers'] final outstanding bill was $66,705.70.

The court ultimately discounted Al Poller's testimony that OCC gave them an oral estimate of $45,000 as "contrary to the weight of evidence on the record and [the Pollers'] own claim that OCC did not provide them with an estimate in [their] cause of action asserted under Iowa Code [section] 537B.3."

Substantial evidence supports the district court's detailed findings, including the credibility finding against Al Poller. *See Etchen v. Holiday Rambler Corp.*, 574 N.W.2d 355, 360 (Iowa Ct. App. 1997) ("The district court has a better opportunity than the appellate court to evaluate the credibility of witnesses.").

Based on these findings, the court first addressed provisions of Iowa Code chapter 537B requiring suppliers to provide consumers with written estimates. The court concluded, "[B]y providing Plaintiffs with their hourly labor rate, OCC complied with the requirements of Iowa Code § 537B.3(2)(b)," which "permissibly grants OCC the choice to write the written estimate on the authorization form or state an hourly labor charge." The court further concluded, "Deb's action of

shipping the '31 Chevy was an acceptance of OCC's offer, authorizing OCC to restore her '31 Chevy based upon their $65.00 per hour time plus the cost of materials." The court finally stated, "What Deb's action of shipping the '31 Chevy was not, was a consumer authorizing, in writing or orally, repairs or services upon a motor vehicle prior to the commencement of the repairs or services, which would trigger the requisite authorization form and mandatory conspicuous disclosure pursuant to Iowa Code § 537B.3(1) & (3)."

The court proceeded to the question of whether OCC engaged in deceptive acts or practices. The court determined all "the work was authorized" and concluded that the Pollers "failed to prove any of the alleged OCC violations of Iowa's 'Motor Vehicle Service Trade Practices Act.'" As a result, the court rejected their "inchoate claim for treble damages, based on § 537B deceptive acts, pursuant to Iowa Code § 714H.5(4)."

The Pollers contend that, contrary to court's conclusions, they were entitled to a written estimate of the total cost of the restoration, they "were denied" notices of "a reasonably anticipated completion date" and "their right to place [a] budgetary cap on the project," and OCC engaged in deceptive practices. We need not decide whether OCC violated the disclosure and fraud provisions of the chapter because the Pollers did not establish that they sustained actual damages.[1]

---

[1] The district court found no entitlement to damages based on its conclusions that OCC did not violate any provisions of chapter 537B. But the court evaluated the Pollers' claimed losses in the context of OCC's breach-of-contract counterclaim, affording us a sufficient record to assess the question. *See McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 532–33 (Iowa 2015) (noting claim of consumer fraud "rises or falls with her breach of contract claim").

We begin with the statutory remedy. Iowa Code section 714H.5 states, "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages." With certain exceptions not applicable here, "actual damages" are "all compensatory damages proximately caused by the prohibited practice or act that are reasonably ascertainable in amount." Iowa Code § 714H.2(1). "'Proximately caused' or proximate causation is a legal term of art that refers to the 'scope of liability.'" *Deng v. White*, No. 18-1672, 2019 WL 6358427, at *5 (Iowa Ct. App. Nov. 27, 2019) (quoting *Thompson v. Kaczinski*, 774 N.W.2d 829, 837 (Iowa 2009)).

As noted, the district court found the work performed by OCC was authorized, a finding that is supported by substantial evidence. In the context of OCC's breach-of-contract claim, the court also determined "every stage of the restoration process was a work in progress that involved the [Pollers] in the decision matrix that led to the ultimate cost of the time and materials billed." These findings refute the Pollers' assertion that OCC upgraded the quality of the restoration without their permission. Finally, the court determined the Pollers failed to mitigate their damages by terminating the agreement or "indicat[ing] that they did not want to authorize further restoration after receiving the bill and paying initially $35,000 and an additional $10,000 in November 2014." *See Deng*, 2019 WL 6358427, at *5 ("Deng's harm—the loss of her property—was the result of her not taking charge of her property after it was removed from the apartment, not the Defendants' actions in removing the property.").

Based on the court's findings, and particularly the finding that all the work was authorized, the Pollers could not have established entitlement to actual damages even if they proved violations of Iowa Code sections 537B.3 and 537B.6. *Cf. Kaskin v. John Lynch Chevrolet-Pontiac Sales, Inc.*, 767 N.W.2d 394, 402 n.6 (Wis. Ct. App. 2009) ("[A] customer finding a violation of the written estimate requirement has not suffered a pecuniary loss if the customer admits to authorizing the repairs. However, if the customer does not admit to authorizing the repairs and the trial court finds that the customer did not authorize the repairs as a matter of fact, then the shop *may never collect for the unauthorized repairs under any legal theory*. The lack of customer authorization is never a technical violation." (citations omitted)).

As noted, the Pollers also requested exemplary damages pursuant to Iowa Code section 714H.5(4) for "willful and wanton disregard for the rights or safety of another." The court's findings on the breach-of-contract counterclaim make it abundantly clear that the standard was not satisfied. *See Scibek v. Longette*, 770 A.2d 1242, 1249–51 (N.J. Super. Ct. App. Div. 2001) (finding no "ascertainable loss" resulting from a repair shop's "failure to provide a written estimate and obtain a written authorization"). Accordingly, we conclude the Pollers were not entitled to exemplary damages.

As for the Pollers' claim for attorney fees, the statute premises an award on an award of actual damages. *See* Iowa Code § 714H.5(2). Because the Pollers were not entitled to actual damages, we conclude they were not entitled to attorney fees.

## II.    *Breach-of-Contract Counterclaim*

The Pollers contend, "It is illogical and against clear public policy to allow OCC to collect for monies it attempted to earn in violation of a consumer protection statute." We would agree if Iowa had a strict liability statute. But, as noted, section 714H.5 limits damages for violations of chapter 537B to "actual damages" incurred "as the result of a prohibited practice." OCC, then, is not foreclosed from recovering damages on its breach-of-contract counterclaim based on its violation of chapter 537B.

Alternatively, the Pollers contend, "Even if OCC had not violated Iowa Chapter 537B, OCC breached the parties' contract before any breach by the Pollers." They point to OCC's failure "to provide monthly invoices as agreed to between the parties." As noted, the district court found that Deb was told "OCC would be providing monthly invoices to the [Pollers] so they could track the costs of the project." But the court placed the onus on the Pollers to follow up when they did not receive them. The court stated:

> Following the $35,000 payment, OCC continued to work on behalf of the [Pollers] without any dispute, emails, or communication complaining about the billing that was occurring on a monthly basis beginning in August [2014] and continually occurring through the end of the project. OCC continued to work to complete the project as quickly as they could while simultaneously requesting that the consistent and delinquent ongoing billing be caught up. Ultimately, rather than stopping the project, after giving the [Pollers] that opportunity, it was completed. Unfortunately, by this time in the project, the [Pollers] were approximately $67,000 behind in payments.

Substantial evidence supports the district court's findings that the Pollers failed to insist on adherence to the policy of providing monthly invoices and acquiesced in continued work without the invoices. Accordingly, we are not persuaded by the

Pollers' contention that OCC's non-compliance foreclosed OCC's claim for contract damages.

**AFFIRMED.**

All judges concur, except Vaitheswaran, P.J., who concurs specially.

**VAITHESWARAN, P.J.** (concurring specially).

As a preliminary matter, I would find that Okoboji Classic Cars, LLC (OCC) preserved the issue of whether Iowa Code chapter 537B (2016) applies by raising the issue before trial. I would also find that chapter 537B applies to OCC. First, I would find OCC contracted for the "repairs" or "service" of a motor vehicle. Iowa Code § 537B.2(3). OCC's manager testified that OCC did "mechanical work," "body work," and "upholstery work." He informed Deb Poller that OCC would "clean the car up" and would perform "additional body work." He also communicated with Deb about car parts that would be obtained and installed. Based on these undisputed facts concerning the nature of OCC's work, I would conclude OCC met the definition of "supplier." *See Schuster v. Dragone Classic Motor Cars, Inc*, 98 F. Supp. 2d 441, 448 (S.D.N.Y. 2000) (noting Connecticut "statute defines 'motor vehicle repair shop' . . . as including any qualified person having a suitable place of business and equipment engaged in repairing '*any* motor vehicle,' and it is clear that 'antique, rare or special interest' automobiles are considered 'motor vehicles'" (footnotes omitted)); *Montgomery v. Nostalgia Lane, Inc.*, 891 N.E.2d 994, 999, 1001 (Ill. App. Ct. 2008) (stating "Defendant's written estimate stated that defendant would address the 'engine, trans[mission], drive train, interior, body,' and would 'detail and color all items correctly, replace + restore all trim.' One can hardly imagine how these tasks do not amount to 'automotive repair,'" and concluding "the term 'automotive repair' encompasses the restoration of a vintage car to or near its original state"); *Morris v. Gregory*, 661 A.2d 712, 717 (Md. 1995) ("[T]he restoration of an antique car is not distinguishable, for purposes of [the Maryland Automobile Repair Facility Act], from

body work on any other vehicle, as the Legislature has not provided such an exception.").

Second, I would conclude the partially disassembled car shipped to OCC was a "motor vehicle" within the meaning of the statute. *See* Iowa Code § 537B.2(2). If that were not the case, there would be no reason to require the disclosure of "reassembly" charges. *See id.* § 537B.6(5); *Montgomery*, 891 N.E.2d at 1001 ("[The Illinois Automotive Repair Act] requires an estimate to disclose disassembly costs when the diagnosis requires that the entire car be taken apart, which is precisely what defendant does in performing its service."). Additionally, OCC's manager referred to the shipped Chevrolet as "the car and parts" and characterized the ensemble as "a really nice car." A former employee similarly testified the vehicle "was very complete." He said "the major components were there, the motor, transmission, frame, running gear, wheels." And Al Poller testified the car was "[a]lmost drivable." *See In re Bailey*, 326 B.R. 750, 757 (Bankr. S. D. Iowa 2004) ("[T]he Court concludes that the ordinary and common meaning of the term 'motor vehicle' includes an inoperable vehicle that can be made operable by reassembling one [or] more of its parts or by repairing one or more of its parts."); *cf. Nelson v. Merchs. Bonding Co.*, 425 N.W.2d 433, 436 (Iowa Ct. App. 1988) ("The Code contemplates that a vehicle or motor vehicle will be an apparatus by which people or property may be transported. Specifically excluded is a device which must be moved by human power. The assembly of parts at issue here was incapable of movement since any means of propulsion (such as an engine) was lacking. These parts, even when assembled, are not capable of

transporting people or property.").  Deb also testified the vehicle would have to be "[r]egistered and insured" if she wanted to drive it on the New Jersey roadways.

Finally, there is no question the Pollers satisfied the definition of "consumer."  *See* Iowa Code § 537B.2(1).

Next, I would address the Pollers' claim that OCC violated sections 537B.3(2)(b) and 537B.3(3).  Section 537B.3(2)(b) states:

> If a written estimate is requested, the supplier may write the written estimate on the authorization form or on another form.  If the nature of repairs or service is unknown at the time that the estimate is given, the supplier may state an hourly labor charge for the work.  If the consumer so requests, a copy of the written estimate shall be provided to the consumer prior to the commencement of any repairs or service.

*Id.* § 537B.3(2)(2)(b).  Section 537B.3(3) states:

> If a consumer orally authorizes repairs or service upon a motor vehicle prior to the commencement of the repairs or service, the supplier shall inform the consumer of the right to receive a written or oral estimate.  The supplier shall note the consumer's response on the form described in subsections 1 and 2.  If the consumer requests an estimate, the supplier shall provide the estimate to the consumer prior to commencing the repairs or service.

*Id.* § 537B.3(3).  Section 537B.3(2)(b) does not authorize substitution of an hourly labor charge for an estimate, if a consumer requests an estimate.  Iowa Code section 537B.3(3) governing oral authorization to perform service similarly states, "If the consumer requests an estimate, the supplier shall provide the estimate to the consumer prior to commencing the repairs or service."

The Pollers requested an estimate.  The district court found OCC did not provide an estimate.  That finding was supported by the OCC manager's testimony that he informed Deb, "we don't give estimates"; "we don't do quotes on cars." When asked if this was an OCC policy, he responded, "Yes, it is."  He admitted he

was unaware of chapter 537B's requirements to provide estimates. OCC's office manager similarly testified it was not OCC's policy to give estimates, as did the employee in charge of the auto body department. In my view, OCC's failure to provide an estimate prior to commencing repairs or service violated Iowa Code section 537B.3(2)(b) and (3).

I recognize the Pollers shipped the vehicle to Iowa. But I am not convinced that act obviated the need to comply with those statutory requirements. Although I would concede substantial evidence supports the court's determination that the shipment amounted to an acceptance of an offer to proceed on a time-and-materials basis,[2] I believe the statute still required OCC to provide an estimate upon request before commencing work.

Nor am I convinced that the act of shipping the vehicle constituted a waiver of the Pollers' request for an estimate. Chapter 537B does not authorize a waiver and, indeed, characterizes any efforts by a supplier to condition performance of services on a waiver a deceptive act or practice. *See* Iowa Code § 537B.6(2); *cf. Schuster*, 98 F. Supp. 2d at 449 ("The statute expressly permits a customer to waive in writing the right to an estimate . . . ."); *Siam Motors, Inc. v. Spivey*, 136 So. 3d 692, 694 (Fla. Dist. Ct. App. 2014) (finding "[t]he trial court correctly stated in the final judgment that even if Spivey waived the initial written estimate by leaving the vehicle at the shop with its keys, Siam Motors was still required to comply with [Florida Statutes] section 559.905(5)," which "states that 'upon

---

[2] There is evidence that would support a contrary determination, but our standard of review requires us to focus on the evidence supporting the fact findings actually made, which I agree were detailed and thorough.

completion of diagnostic work necessary to estimate the cost of repair, the shop shall notify the customer as required in [section] 559.909(1),'" but concluding the trial court erred in holding a verbal estimate was insufficient to satisfy the statute).

True, the Pollers could have curtailed their relationship on or after the December 2013 meeting. But, in my view, whether they could have taken action to mitigate their expenses has no bearing on whether OCC violated chapter 537B. *Cf. Kaskin v. John Lynch Chevrolet-Pontiac Sales*, *Inc.*, 767 N.W.2d 394, 403 (Wis. Ct. App. 2009) ("It is not the consumer's burden to prove that he or she would have done something differently had the proper information been given. Rather, the burden is wholly upon the repair shop.").

Having found a violation of the requirements to provide an estimate, I would also find a violation of Iowa Code section 537B.6(1), which makes it "a deceptive act or practice for a supplier to: [f]ail to comply with the requirements of section 537B.3."

All that said, I agree the Pollers did not prove actual damages resulting from the violations. I also agree with the district court's disposition of the breach-of-contract counterclaim. For these reasons, I too would affirm.